# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

BRIAN J. MEECHA,

    Plaintiff,

  v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Civil Action 2:17-cv-427
Chief Judge Edmund A. Sargus
Chief Magistrate Judge Elizabeth P. Deavers

## REPORT AND RECOMMENDATION

Plaintiff, Brian J. Meecha, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 9). Plaintiff did not file a Reply. For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

Plaintiff protectively filed his application for benefits in June 2011, alleging that he has been disabled since February 9, 2007, due to bipolar disorder, depression, and social anxiety disorder. (R. at 208-13, 236.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.

Following an initial hearing on April 2, 2013, Administrative Law Judge Edmund E. Giorgione (the "ALJ") issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 116–22.)

On August 7, 2014, the Appeals Council subsequently vacated and remanded ALJ Giorgione's decision. (R. at 128-30.) Plaintiff and a vocational expert appeared and testified at the subsequent administrative hearing. On June 16, 2015, the ALJ again issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 21–30.) On March 29, 2017, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-5.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the February 3, 2015, administrative hearing that he last worked driving a Zamboni at an ice rink for 5 years. (R. at 45.) He testified that his most severe problems were "just dealing with people, communicating with people, and anger issues and mood swings up and down . . . ." (R. at 46.) Plaintiff testified that prior to getting treatment, he would have "[a]rguments and stuff with family members and friends and pretty much just I couldn't control my anger. And, you know, one day I wake up happy and then later on in the day, I'm just distraught or just not feeling right. And my—I always describe it as I can—it's like the racing thoughts are so much that you can—it's racing so fast—it's racing faster than you can speak." (R. at 47.) He found working with others stressful which led to confrontations; if he

"felt like I was right, then an argument would pursue [*sic*]." (*Id.*)  At the time of this hearing, Plaintiff did not feel he was improving.  (R. at 48.)

Plaintiff also testified that he turned the television on a lot "to have noise in the background." (R. at 49.)  His mind would wander, noting he could "usually stay on task for about 5 to 15 minutes before I start thinking about something else or other thoughts start racing through my head." (*Id.*)

Plaintiff next testified that if he went somewhere, he "usually tend[s] to go there when I think there's not going to be a lot of people there, which is usually around 11:00 before lunch and then 1:00 or 2:00 after lunch." (R. at 50.)  Plaintiff testified that in 2012, his mother supported him and that, around the house, he would mow the lawn and do dishes and sweep.  (R. at 51.)

When he was in school, Plaintiff testified that he did not talk to fellow students.  (R. at 53.)  When they had group projects, he "really didn't want to work with them, and I'd try to do my own thing." (*Id.*)  He explained, "I don't work well with other people.  I just don't.  Never have." (*Id.*)  He also testified that he has "never slept well" and has tried sleeping pills, but they rarely work.  (*Id.*)  Plaintiff testified as to his medication changes and/or increases over the years noting that, "I don't think it's something you can medicate away.  You can't medicate a person's thoughts away." (R. at 55.)

**B.     Vocational Expert Testimony**

Carl Hartung testified as the vocational expert (the "VE") at the supplemental administrative hearing.  (R. at 56-61.)  The VE identified Plaintiff's past relevant work as a Zamboni operator, classified as a skating rink ice maker, a medium, unskilled position.  (R. at

3

57.) The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 57-59.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could perform his past relevant work, but that he has no transferrable skills. (R. at 57-58.) The VE also testified the hypothetical individual could perform approximately 1,063 medium exertion, unskilled jobs in the regional economy, with 6,495 in the state and 155,732 nationally, such as a laboratory equipment cleaner, salvage laborer, and sexton (an individual who performs custodial and cleaning work in a church). (R. at 58-59.)

### III. MEDICAL RECORDS

**A. T. Rodney Swearingen, Ph.D.**

On July 14, 2011, Dr. Swearingen evaluated Plaintiff for disability purposes. (R. at 338-43.) Plaintiff reported that he has less contact with his neighbors than he used to because he is more secluded. (R. at 340.) Plaintiff also reported waking up by 9:00 a.m. everyday, taking care of his dogs, going to the store, getting food at a drive-thru, hosting friends, and cleaning the house with his mother, although she does the shopping because he would "mess it up." (*Id*.) On mental status examination, Plaintiff exhibited inconsistent eye contact, a moderately dysphoric and anxious mood, psychomotor agitation, and limited insight and judgment. (R. at 340-41.) He reported feelings of nervousness and anxiety. (R.at 341.) Plaintiff reported he does not socialize often and that his mother does the shopping, although he also reported he goes to the store. (R. at 340.) Dr. Swearingen diagnosed bipolar disorder (not otherwise specified), depressive

4

disorder (not otherwise specified), and social phobia. (R. at 342.) He assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 50.[1] (*Id.*)

Dr. Swearingen opined that Plaintiff would have difficulty responding appropriately to others in the work setting and responding to stress in the work setting effectively. (*Id.*) Dr. Swearingen also opined that Plaintiff can "applying instructions requiring average intellectual functioning if he is shown what to do, otherwise he may have difficulty." (R. at 343.) He further opined that Plaintiff's concentration and persistence is "good," his pace on task is "average," and he is "fair" at performing repetitive tasks, giving him the "ability to perform simple and multi-step tasks." (*Id.*)

**B.     Y. Kristine Tsai, M.D.**

Plaintiff treated with primary care physician, Dr. Tsia since at least February 2002. (R. at 356.) In October 2011, Plaintiff reported poor sleep and racing thoughts. (R. at 346.) He also reported recent increased stress, which he believed made his symptoms worse. (*Id.*) Dr. Tsai assessed bipolar disorder and prescribed Seroquel. (*Id.*) The following month, Dr. Tsai found Plaintiff "significantly more stable," but Plaintiff reported that his medications became less

---

[1] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR"). A GAF score of 50 is indicative of "severe symptoms . . . or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) . . . ." *Id.* at 34. Notably, the current, fifth edition of the DSM, which was issued on May 13, 2013, prior to the ALJ's decision, abandoned use of the GAF scale because of "its lack of conceptual clarity . . . and questionable psychometrics in routine practice." Am. Psych. Assn., DSM–V 16 (2013).

effective at the end of the day. (R. at 345.) Dr. Tsai increased Plaintiff's Seroquel dose. (*Id.*) By April 2012, Plaintiff reported feeling a bit worse in recent weeks, with racing thoughts and irritability, as well as poor sleep and distractibility. (R. at 364.) Dr. Tsai increased Plaintiff's Seroquel dose. (*Id.*) Dr. Tsai reported that Plaintiff had "followed up with me today in an office visit for re-check of his Bipolar [disorder]. The recent stressors in his life are making symptoms worse; he is currently being treated with Seroquel and we had to increase the dose today." (R. at 368.) In May 2012, Plaintiff reported that he had been recently incarcerated for three days and unable to take his medication; Dr. Tsai re-started Plaintiff's Seroquel. (R. at 363.)

**C.     John L. Tilley, Psy.D.**

Dr. Tilley evaluated Plaintiff on July 1, 2012 as part of his pre-sentence investigation. (R. at 369-81.) Plaintiff was then on probation for aggravated menacing and telecommunications harassment. (R. at 370.) Plaintiff endorsed a lengthy history of receiving mental health services, beginning at the age of five and said that he carries a diagnosis of bipolar disorder and has been treated with a variety of psychiatric medications over the years. (R. at 372, 380.) On mental status examination, Dr. Tilley found Plaintiff exhibited a somewhat pressured speech, an irritable and dysphoric mood, an irritable and easily agitated affect, pre-occupation with legal problems, statements "saturated with notions of persecution and conspiracy," tangential thought processes, lack of insight, questionable judgment, limited reasoning abilities, and impaired cognitive processes of attention and concentration. (R. at 373-75, 380.) Specifically, Dr. Tilley noted Plaintiff presented with "fairly obvious signs of personality pathology, including narcissism, antisocial attitudes, paranoia, and litigiousness." (R. at 373.) Dr. Tilley reported, "[Plaintiff]

6

seemed immediately annoyed by me and resentful of the evaluation and, early on, he was oppositional, challenging, sometimes accusatory, and only minimally cooperative." (R. at 374.) He found Plaintiff exhibited "fairly significant narcissistic and antisocial traits." (*Id.*) Dr. Tilley diagnosed bipolar II disorder which was currently controlled with pharmacotherapy, and personality disorder (not otherwise specified) with prominent narcissistic and antisocial features. He assigned Plaintiff a GAF score of 50. (R. at 375.) Dr. Tilley opined that Plaintiff's bipolar disorder was controlled at the time. (R. at 376.) Dr. Tilley also opined that Plaintiff had a significant personality disorder, "which is predominated by narcissistic and antisocial features. He is, as a result of his personality pathology, inclined to be grandiose, paranoid, litigious, accusatory, oppositional, defiant, stubborn, and challenging." (*Id.*) He further opined that Plaintiff's personality disorder was "his largest obstacle." (R. at 377.) Dr. Tilley opined that Plaintiff needed more specialized treatment than the current primary care mental health treatment he was receiving. (*Id.*) Overall, Dr. Tilley found Plaintiff's conditions "amenable to treatment." (R. at 376.)

Dr. Tilley also completed a Mental Functional Capacity Assessment in which he opined Plaintiff would have extreme impairment in his ability to maintain attention and concentration for extended periods and accept instructions and respond appropriately to criticism from supervisors. (R. at 379.) Dr. Tilley also opined Plaintiff would have marked impairment in his ability to understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and to

perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and set realistic goals or make plans independently of others. (*Id.*)  Dr. Tilley concluded that Plaintiff would be unemployable for a period of at least twelve months. (R. at 381.)

In his letter to the court, Dr. Tilley reported, "Based on my evaluation, it is my opinion that the defendant has a bipolar II disorder, which is currently controlled with medication, and has prominent personality pathology of a narcissistic and antisocial nature." (R. at 369.)

**D.     State Agency Evaluations**

On January 4, 2012, following contact with Plaintiff, the stage agency completed a Special Determination Regarding the Issue of Similar Fault.  The interviewer determined that

> [t]he medical evidence shows the claimant reported a number of severe mental health symptoms at his psychological consultative examination.  The mental status exam noted the claimant's mood was moderately dysphoric and anxious.  In contrast, the claimant did not exhibit any abnormal behavior during his interview with investigators in November 2011 (per the ROI).  Despite reporting that he does not socialize often, reports show the claimant has a friend that visits his regularly and his online networking accounts express his desire to promote and collaborate with musical artists.  Internet content shows despite his reported severe symptoms, the claimant has been able to develop a website to reach out to music talent and listeners.  His recent charge of telephone harassment does not appear consistent with his anxiety.  The claimant has reported he walks his dogs three times a day, goes to the store twice a day, drives and goes to the drive-thru.  Reports also indicate the claimant has performed work activity since his alleged onset date.  This work has not been reported to SSA, so the earnings and total number of hours of his part-time employment is unclear.

(R. at 87.)

On January 4, 2012, after review of Plaintiff's medical record, Patricia Semmelman, Ph.D., a state agency psychologist, evaluated Plaintiff's mental condition and opined that

Plaintiff has no restrictions in his activities of daily living; moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace; and, no episodes of decompensation of an extended duration. (R. at 94.) She further determined that the evidence did not establish the presence of the "C" criteria. (*Id.*) Dr. Semmelman found Plaintiff partially credible, noting Plaintiff's reported symptoms are not severe to the degree he alleges. (R. at 95.) Despite reporting marked difficulty with mood swings and anxiety, he engages in many normal daily activities. (*Id.*) She gave great weight to Dr. Swearingen's opinion. (*Id.*)

In completing the MRFC[2], Dr. Semmelman opined that Plaintiff would have some reduced stress tolerance due to depression. (R. at 96.) Dr. Semmelman also opined that Plaintiff is able to understand, remember and carry out simple and multiple step job duties and that his reduced stress tolerance would preclude him from performing detailed tasks. (R. at 97.) Dr. Semmelman further opined that Plaintiff can maintain attention and make decisionsm relate appropriately on a superficial basis, and adapt to a setting in which duties are routine and predictable. (*Id.*)

On March 30, 2012, Frank Orosz, Ph.D. reviewed the record upon reconsideration and affirmed Dr. Semmelman's assessment. (R. at 105-08.)

## IV.   ADMINISTRATIVE DECISION

On June 16, 2015, the ALJ issued his decision. (R. at 21–30.) The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on March 31, 2012.

(R. at 23.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful during the period from his alleged onset date of February 9, 2007 through his date last insured of March 31, 2012. (*Id.*) The ALJ found that, through the date last insured, Plaintiff had the severe impairments of bipolar disorder and social phobia. (R. at 24.) He further found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] find[s] that, through the date last insured, the [Plaintiff] had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine and repetitive tasks; no strict time or production

---

[2]"MRFC" is a residual functional capacity which limits its consideration to mental capabilities.

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> demands; occasional, superficial contact with co-workers, supervisors and the general public; and a static work environment with static processes and procedures.

(R. at 25.) In determining Plaintiff's MRFC, the ALJ gave Dr. Tilley's opinion little weight because it was inconsistent with his letter to the court on July 1, 2012, in which he indicated that Plaintiff's bipolar disorder was controlled with medication and that Plaintiff was amenable to treatment. (R. at 28.) The ALJ also found Dr. Tilley's opinion inconsistent with other evidence of record, including Dr. Swearingen's mental status evaluation, Dr. Tsai's treatment notes and mental status findings, and Plaintiff's activities of daily living. (*Id.*) The ALJ further noted that Dr. Tilley's opinion was rendered past Plaintiff's date last insured and did not relate back. (*Id.*)

The ALJ accorded great weight to the opinions of the state psychological consultants, Dr. Semmelman and Dr. Orosz, finding their opinions "well supported by mental status examinations, treatment notes demonstrating stable symptoms, an unimpressive mental health treatment history and his activities of daily living." (R. at 27.) The ALJ also accorded great weight to the opinion of Dr. Swearingen, the consultative examiner, finding his opinion well-supported by his mental status evaluation, mental status findings and treatment notes from Dr. Tsai, Plaintiff's unimpressive mental health treatment history, and his activities of daily living. (R. at 27-28.)

Relying on the VE's testimony, the ALJ next found that Plaintiff's non-exertional limitations preclude his ability to do past relevant work. The ALJ concluded that Plaintiff can perform other jobs that exist in significant numbers in the national economy. (R. at 28-29.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 29.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In his Statement of Errors, Plaintiff first asserts that the ALJ erred in analyzing the opinion from a consulting psychologist, Dr. Tilley. (ECF No. 14 at pp.10-18). Specifically, Plaintiff argues that the ALJ incorrectly gave Dr. Tilley's opinion evidence "little weight," leading to an RFC unsupported by substantial evidence. (ECF No. 14 at 10-18.) Plaintiff next argues that the ALJ failed to accord independent weight to the GAF score of 50 assigned by Dr. Swearingen. (*Id.* at pp. 18-20). The Court discusses each of these contentions of error in turn.

### A. Dr. Tilley's Opinion Evidence

Plaintiff maintains that the ALJ committed reversible error by allocating only "little weight" to Dr. Tilley's opinion evidence. Specifically, Plaintiff argues that the ALJ was wrong to conclude that Dr. Tilley's opinion evidence does not relate back to the period before the date last insured, that Dr. Tilley's opinions were contradictory, and that Dr. Tilley's opinions conflict with other evidence in the record including Dr. Swearingen's mental status evaluation, Dr. Tsai's treatment notes and mental status findings, and Plaintiff's activities of daily living.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c); see also SSR 96–8p 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions."). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must apply the factors set

13

forth in 20 C.F.R. § 416.927(c), including the examining and treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source.

The Commissioner, nevertheless, reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In support of his argument that Dr. Tilley's opinions relate back to the period before the last insured date, Plaintiff argues that Dr. Tilley based his findings in large part upon documentation that predates March 31, 2012. (*Id*. at 14.) The documentation includes Mr. Meecha's charging statement, a pre-sentence investigation report dated May 9, 2012, and emails and social media posts related to Plaintiff's menacing and harassment charges. (*Id*.)

Plaintiff is correct that the ALJ erred in finding that Dr. Tilley's pre-sentencing report opinion evidence does not relate back to the period prior to the last insured date. Dr. Tilley specifically mentions in his report that he relied on documentation and evidence relating to the period prior to Plaintiff's last insured date. (R. at 370-371.) Furthermore, Dr. Tilley's report discusses Plaintiff's history of mental illness, the effective control of Plaintiff's bipolar disorder since incarceration, and Plaintiff's personality disorder. (R. at 372-375.) Dr. Tilley's report specifically indicates the point at which he believes Plaintiff's condition had recently changed because he was receiving regular medication during incarceration, a point prior to Plaintiff's last insured date. (R. at 376.) Considering the short period of time between Plaintiff's last insured date and the pre-sentencing report, it is clear that Dr. Tilley's letter describes an enduring

collection of symptoms that predate Plaintiff's last insured date. The Undersigned concludes, therefore, that the opinion evidence relates back to the period before March 31, 2012.

Nevertheless, turning to the ALJ's other rationales, the Undersigned finds that substantial evidence supports his decision to accord Dr. Tilley's opinion evidence little weight. A review of the record indicates that Dr. Tilley's opinions are internally inconsistent and contradict other evidence in the record. Despite the severity of Dr. Tilley's opined restrictions, his July 1, 2012, report indicated his belief that Plaintiff's bipolar and personality disorders are "amenable to treatment." (R. at 376.) Furthermore, Dr. Tilley's opined limitations directly contradict Dr. Swearingen's findings with respect to concentration, persistence, and pace. (R. at 343, 379.) Similarly, Dr. Tsai's findings agree with Dr. Tilley's July 1, 2012, opinion that Plaintiff's conditions are controllable with medication and deteriorate when he is untreated. (R. at 345, 363.) The ALJ properly discounted Dr. Tilley's opinions as internally inconsistent and contradictory of other substantial medical evidence in the record. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729-30 (6th Cir. 2013) (holding ALJ did not err in failing to give treating physician opinion controlling weight because it was, *inter alia*, inconsistent with other substantial evidence); 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).
The Undersigned concludes, therefore, that substantial evidence supports the ALJ's allocation of "little weight" to Dr. Tilley's opinion evidence.

For the reasons explained above, the Undersigned finds that Plaintiff's first contention of error is without merit.

15

### B. Plaintiff's GAF Scores

In his second contention of error, Plaintiff argues that the ALJ erred in failing to accord Plaintiff's GAF score assigned by Dr. Swearingen independent weight. (ECF No. 14 at 18.) Although the ALJ accorded Dr. Swearingen's opinion evidence "great weight," failure to give Plaintiff's GAF score of 50 independent weight is not reversible error because a GAF score does not directly correlate to the severity requirements in the social security system's mental disorders listings. Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 2000 WL 1173632, 65 F.R. 50746-01, at *50764-50765 (2000).

This Court has accordingly recognized that GAF scores, while perhaps helpful in assessing a social security claimant's level of functioning, provide only a "snapshot" of that functioning and do not correlate directly to the disability criteria used by the Social Security Administration. *Comberger v. Colvin*, No. 1:14-cv-435, 2015 WL 5013721, at *6 (S.D. Ohio, July 28, 2015), *adopted and affirmed*, 2015 WL 5004596 (S.D. Ohio Aug. 24, 2015). Further, Courts have upheld nondisability findings for Plaintiffs with GAF scores as low as 35. *Turcus v. Soc. Sec. Admin.,* 110 F. App'x. 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

As the Social Security Administration admonishes ALJs in its internal guidance, "GAF ratings need supporting detail" to be useful. SSA, AM–13066, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication" (effective July 22, 2013); SSA, AM–13066 REV, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication—REV" ("AM–13066–REV") (effective Oct. 14, 2014). In the instant case, Dr. Swearingen's opined limitations are the only details competent to explain the functional implications of

16

Plaintiff's GAF score. Considering the "snapshot" quality of a Plaintiff's GAF score and its necessarily limited usefulness in determining disability, a GAF score of 50 is compatible with Dr. Swearingen's opined limitations. *Comberger*, 2015 WL 5013721 at *6. The ALJ discussed Dr. Swearingen's findings at length and noted that his opined limitations were far less severe than Dr. Tilley's. (R. at 27-28.) The ALJ ultimately incorporated Dr. Swearingen's findings in his RFC determination. (R. at 25.) Because the ALJ's RFC determination reflected Dr. Swearingen's findings, including by implication Plaintiff's GAF score, any error in the ALJ's discussion of the opinion evidence is harmless. The Undersigned finds, therefore, that the ALJ did not commit reversible error in declining to assign a separate weight to Dr. Swearingen's GAF determination.

For the reasons explained above, the Undersigned finds that Plaintiff's second contention of error is without merit.

## VII. CONCLUSION

In conclusion, from a review of the record as a whole, the Undersigned finds that substantial evidence supports the ALJ's decision denying benefits. Accordingly, the Undersigned **RECOMMENDS** that the Commissioner of Social Security's decision be **AFFIRMED** and Plaintiff's Statement of Errors be **OVERRULED**.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 27, 2018
　　　　　　　　　　　　　　　　　　　　　　/s/ *Elizabeth A. Preston Deavers*
　　　　　　　　　　　　　　　　　　　　　　Elizabeth A. Preston Deavers
　　　　　　　　　　　　　　　　　　　　　　Chief United States Magistrate Judge